# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TIMOTHY GREG TACKETT,

                    Plaintiff,

v.

CATHY JESS, PAUL KEMPER,
LAURA BARTOW, LORI ALSUM,
EMILY DAVIDSON, LONEL
LEBLANC, GLENN BORNICK, DR.
KEVIN KREMBS, KRISTEN
VASQUEZ, CANDICE WHITMAN,
LAURA FRAZIER, ROXANNE
LYYSKI, JULIE LUDWIG, and
CHARLES LARSON,

                    Defendants.

Case No. 19-CV-258-JPS

**ORDER**

---

Plaintiff, a prisoner proceeding *pro se*, filed an amended complaint against Cathy Jess ("Jess"), Paul Kemper ("Kemper"), Laura Bartow ("Bartow"), Lori Alsum ("Alsum"), Emily Davidson ("Davidson"), Lonel LeBlanc ("LeBlanc"), Glenn Bornick ("Bornick"), Doctor Kevin Krembs ("Krembs"), Kristen Vasquez ("Vasquez"), Candice Whitman ("Whitman"), Laura Frazier ("Frazier"), Roxanne Lyyski ("Lyyski"), Julie Ludwig ("Ludwig"), and Charles Larson ("Larson") (collectively, "Defendants"). (Docket #23). The Western District of Wisconsin screened the complaint and allowed Plaintiff to proceed on claims for deliberate indifference to a serious medical need in violation of his Eighth Amendment rights, and claims for medical negligence under Wisconsin state law. (Docket #26). The case arises from the allegedly poor medical

treatment that Plaintiff received at Racine Correctional Institution ("RCI") and Fox Lake Correctional Institution ("FLCI"), which ultimately required the amputation of his fourth toe.

The case was subsequently transferred to the Eastern District of Wisconsin, and to this branch of the Court, for disposition. On August 22, 2019, Defendants filed a combination motion to dismiss for lack of subject matter jurisdiction and motion for summary judgment. (Docket #83). That motion is now fully briefed. For the reasons explained below, the Court will grant the motion to dismiss in part, and deny it in part. The motion for summary judgment will be granted in full. The Court will decline to exercise supplemental jurisdiction over any remaining state law negligence claims, and the action will be dismissed.

## 1.    MOTION TO DISMISS

### 1.1    Standard of Review

The Court evaluates challenges to jurisdictional sufficiency under Federal Rule of Civil Procedure 12(b)(1), which allows the Court to dismiss actions over which it lacks subject-matter jurisdiction. When faced with a jurisdictional challenge, the Court accepts as true the well-pleaded factual allegations found in the complaint, drawing all reasonable inferences in favor of the plaintiff. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014).

### 1.2    Relevant Allegations and Analysis

Defendants argue that Plaintiff's negligence claims stemming from his interactions with Kemper, Dr. Krembs, Vasquez, Frazier, LeBlanc, and Bornick must be dismissed because Plaintiff has failed to provide timely notice of the claim under Wisconsin's notice of claim statute. Wis. Stat. § 893.82(3). The statute requires, as a precondition to suit against a state

employee, that notice be served upon the attorney general within 120 days of the event-causing injury. *Id.* The statute is treated as jurisdictional. *Badger Catholic, Inc. v. Walsh*, 620 F.3d 775, 782 (7th Cir. 2010). However, Wis. Stat. § 893.82 does not apply to medical malpractice claims. Wis. Stat. § 893.82(5m) ("With regard to a claim to recover damages for medical malpractice, the provisions [requiring notice of claim] do not apply."); *see also Hines v. Resnick*, 807 N.W.2d 687, 690 n.3 (Wis. Ct. App. 2011) (noting that "[n]otices of claim under Wis. Stat. § 893.82 are no longer required for medical malpractice claims.").

Plaintiff does not dispute that he failed to provide a notice of claim to the defendants. He submits that he was not required to do this under Wis. Stat. § 893.82(5m). He is correct as far as the medical defendants who may have committed medical malpractice are concerned—i.e., Dr. Krembs and nurses Frazier and Vasquez. Defendants submit that Frazier and Vasquez—nurses who worked in a largely administrative capacity—are not liable for medical malpractice, but they do not cite any authority for this position. Thus, the negligence claims against Dr. Krembs, Frazier, and Vasquez will move forward, and will be discussed in Section 2.3.3, *infra*.

Kemper, LeBlanc, and Bornick are not medical professionals and were not involved in Plaintiff's medical care. As to these three defendants, a notice of claim must have been issued within 120 days of the event causing injury. Wis. Stat. § 983.82(3). Accordingly, the negligence claims as to those defendants will be dismissed without prejudice.

2.    **SUMMARY JUDGMENT**

   2.1    **Legal Standard**

      2.1.1    **Summary Judgment**

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

      2.1.2    **Exhaustion of Prisoner Administrative Remedies**

The Prison Litigation Reform Act ("PLRA") establishes that, prior to filing a lawsuit complaining about prison conditions, a prisoner must exhaust "such administrative remedies as are available[.]" 42 U.S.C. § 1997e(a). To do so, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). He must do so precisely in accordance with those rules; substantial compliance does not satisfy the PLRA. *Id.*; *Burrell v. Powers*, 431 F.3d 282, 284–85 (7th Cir. 2005). A suit must be dismissed if it was filed before exhaustion was complete, even if exhaustion is achieved before judgment is entered. *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999). Several important policy goals animate the exhaustion requirement, including restricting frivolous claims,

giving prison officials the opportunity to address situations internally, giving the parties the opportunity to develop the factual record, and reducing the scope of litigation. *Smith v. Zachary*, 255 F.3d 446, 450–51 (7th Cir. 2001). Failure to exhaust administrative remedies is an affirmative defense to be proven by Defendants. *Westefer v. Snyder*, 422 F.3d 570, 577 (7th Cir. 2005).

The Wisconsin Department of Corrections maintains an Inmate Complaint Review System ("ICRS") to provide a forum for administrative complaints. Wis. Admin. Code § DOC 310.04. There are two steps an inmate must take to exhaust their administrative remedies under the ICRS. First, the inmate must file an offender complaint with the Institution Complaint Examiner ("ICE") within fourteen days of the events giving rise to the complaint. *Id.* § DOC 310.07(2). The ICE may reject the complaint or return the complaint to the inmate and allow him or her to correct the issue(s) and re-file within ten days. *See id.* § DOC 310.10(5),(6). If the complaint is rejected, the inmate may appeal the rejection to the appropriate reviewing authority within ten days. *Id.* § DOC 310.10(10).[1] If the complaint is not rejected, the ICE issues a recommendation for disposing of the complaint, either dismissal or affirmance, to the reviewing authority. *Id.* § DOC 310.10(9),(12). The reviewing authority will affirm or dismiss the complaint in whole or in part, or return the complaint to the ICE for further investigation. *Id.* § DOC 310.11(2).

Second, if the ICE recommends dismissal and the reviewing authority accepts it, the inmate may appeal the decision to the Corrections

_____

[1] The ICRS defines a "reviewing authority" as "a person who is authorized to review and decide an inmate complaint." Wis. Admin. Code § DOC 310.03(15).

Complaint Examiner ("CCE") within fourteen days. *Id.* §§ DOC 310.09(1), 310.12. The CCE issues a recommendation to the Secretary of the Department of Corrections who may accept or reject it. *Id.* §§ DOC 310.12(2), 310.13. Upon receiving the Secretary's decision, or after ninety days from the date the Secretary received the recommendation, the inmate's administrative remedies are exhausted. *Id.* § DOC 310.13(4).

### 2.2   Relevant Facts

#### 2.2.1   Care at Racine Correctional Institution

In July 2015, Plaintiff worked for the maintenance department at RCI. On July 9, while Plaintiff was at work, a printer dropped on his foot causing excruciating pain in his toes. Initially, Plaintiff thought he might have a bone bruise, and tried to persevere. However, the pain never abated. On the morning of July 13, he asked to be sent to the Health Services Unit ("HSU") for evaluation. At the HSU, Plaintiff received Tylenol and an ice bag for the pain.

Between July 2015 and April 2016, Plaintiff submitted multiple Health Service Requests ("HSRs") complaining about his foot. Following an HSR submitted on July 17, Plaintiff was seen in the HSU and received a cane. He was also encouraged to elevate his foot and take ibuprofen. On August 27, Plaintiff submitted another HSR complaining that the ibuprofen did not help, and his toes "popped" when he bent them. On August 31, Plaintiff submitted another HSR in which he explained that he had stretched his toes and they felt better—accordingly, he requested that the HSR from August 27 be disregarded.

On September 20, 2015 Plaintiff submitted another HSR complaining of toe pain from his injury in July. The HSU scheduled him for an appointment with a doctor in early October. Plaintiff's appointment was

initially scheduled for October 13, but it was unexpectedly cancelled. Plaintiff wrote to Vasquez, who informed him that the appointment had been rescheduled for October 30. Vasquez told him that if he needed assistance before then, he could request help from a nurse.

On October 30, 2015 Dr. Krembs examined Plaintiff and conducted an x-ray of the foot to check for a fracture. Dr. Krembs also prescribed naproxen for his neck and foot pain. On November 11, the radiologist, Dr. Michael Hinz, concluded that the left foot was "normal." (Docket #98-1 at 17.) Relying on these findings, Dr. Krembs addressed Plaintiff's pain by prescribing steroid injections and nortriptyline.

On December 1, 2015 Plaintiff filed an HSR explaining that a refill of nortriptyline was never received. He was seen at the HSU the next day, whereupon his prescription was filled and his x-ray reviewed again. He was instructed to continue taking the medication as prescribed and rest.

On January 21, 2016, Plaintiff began steroid treatment overseen by Dr. Krembs. When the steroid treatment began, Dr. Krembs discontinued the nortriptyline. On February 23, at a follow-up appointment, Dr. Krembs determined that Plaintiff had not made any progress. Accordingly, Dr. Krembs referred Plaintiff to an outside podiatrist, Dr. Matthew Larsen. The appointment was considered a "moderate priority."

On April 7, 2016, Plaintiff saw Dr. Matthew Larsen (not to be confused with defendant Dr. Charles Larson), who ordered another x-ray and, upon review, concluded that the "left foot is intact. No acute or chronic abnormalities identified. No joint effusion is seen." (Docket 87-1 at 88). According to Plaintiff, Dr. Matthew Larsen pointed to a hairline fracture in his foot. The record does not indicate this. Dr. Matthew Larsen diagnosed Plaintiff with metatarsalgia, an inflammation of the ball of the foot, and

neuropraxia, a mild form of nerve damage. Dr. Matthew Larsen eschewed an MRI or CT scan for the time being, and recommended custom orthotics. If those did not work, he proposed cortisone injections. Dr. Matthew Larsen suggested that Plaintiff return in approximately three months to follow up on the pain. Dr. Krembs reviewed Dr. Matthew Larsen's report on April 25, and referred Plaintiff for the orthotics.

At some point, either two or three months later, Plaintiff saw an orthopedist for his orthotics fitting. On July 16, 2016, Plaintiff submitted an HSR seeking a change in prescription from naproxen to extra-strength Tylenol. He was told to raise the issue at his doctor's appointment later in the month. Plaintiff saw Dr. Krembs on July 29 for the follow-up, where they discussed the orthotics, which were still forthcoming.

On September 7, 2016, Plaintiff had his final fitting with the orthopedist, and was instructed on how to break the orthotics in. On October 26, Plaintiff was seen by the HSU. He sought treatment by a doctor rather than a nurse. He was told to submit an appointment request if he wished to see a doctor. On November 22, Dr. Krembs examined Plaintiff to assess his improvement. Dr. Krembs believed that Plaintiff's condition had improved, but Plaintiff was still in considerable pain and did not feel any improvement. Dr. Krembs prescribed duloxetine, and ordered Plaintiff to follow up in six months to check on the progress.

On January 17, 2017, Plaintiff attended an appointment with Dr. Krembs and reported that the duloxetine was not working. Dr. Krembs discontinued the duloxetine and ordered a prescription of gabapentin. Plaintiff inquired about an MRI and going back to see Dr. Matthew Larsen for follow up, but no follow up appointment was scheduled.

On February 9, 2017, Plaintiff went to the HSU due to his continuing pain. Dr. Krembs increased his dosage of gabapentin from 400 mg to 600 mg. On March 28, 2017, Plaintiff was seen at the HSU for his foot and shoulder pain. A nurse evaluated Plaintiff and his medical records, and determined that he should continue taking his medications as prescribed.

On May 31, 2017 Plaintiff returned to the HSU complaining that he was still in serious pain, the gabapentin had not worked, and he had not received his follow up with the podiatrist. Dr. Krembs met with him and discussed his concerns, and recommended that he continue taking his medications as prescribed. On June 6, 2017, Plaintiff was transferred to FLCI.

### 2.2.2   Care at Fox Lake Correctional Institution.

On June 8, 2017, within two days of arrival at FLCI, Plaintiff was seen in the HSU by Nurse Sherri Pulda, who noted that he had orthotics, gave him a low bunk restriction, and scheduled him for an appointment with an "Advanced Care Provider" within 14 days. On June 16, 2017, Nurse Robert Frank ("Frank") saw Plaintiff regarding his foot and shoulder pain. Frank reviewed the medical chart, offsite records, and assessed Plaintiff's foot. Frank did not have any additional recommendations, but referred Plaintiff to another podiatrist in light of a note from the last podiatrist, Dr. Matthew Larsen, that Plaintiff should return if symptoms persisted. Thus, on August 9, 2017, Plaintiff was seen by doctor Robert Bertram ("Bertram"), who gave Plaintiff a cortisol injection to treat the pain. He continued Plaintiff's ibuprofen, discontinued the gabapentin, and recommended a follow-up in two weeks.

On August 30, 2017, Plaintiff returned for a follow up. On that date, Dr. Bertram diagnosed Plaintiff with toenail fungus and Morton's neuroma,

a painful condition involving the tissue and nerves in the ball of one's foot. Dr. Bertram prescribed a cream for the fungus, performed another cortisol injection, and continued the ibuprofen. Plaintiff returned for another follow up on September 20, 2017. At this point, Dr. Bertram recommended an MRI to investigate the foot's condition. Based on the results of the MRI, surgery might be indicated. Dr. Charles Larson, a physician at FLCI, ordered the MRI.

On November 2, 2017, the MRI was performed, which showed metatarsal capsulitis, which involves inflammation and damage to the joint capsule of the toe and surrounding tissue, as well as metatarsal bursitis. On November 7, 2017, Dr. Bertram performed surgery to remove the bursitis tissue. Dr. Bertram also recommended 600 mg ibuprofen every eight hours for 14 days, and 5 mg of Norco every six hours as needed for five days. Once returned to FLCI, Plaintiff was given a dose of Norco, ice, an extra pillow, and either crutches or wheelchair access depending on the distance he needed to travel within the prison.

There are different ways in which round-the-clock prescription medications are dispensed at FLCI. One is "QID," or *quarter in die*, which calls for medication to be dispensed at each of the four medications passes, which occur every four hours. Another is "PRN" or *pro re nata*, which allows an inmate to access medication as needed. Plaintiff's original Norco prescription was erroneously written as QID PRN—meaning he received it during the medications pass four times per day as needed, but not at the prescribed six-hour intervals. On November 15, 2017, the prescription was changed to simply PRN, enabling him to access it at night. (Docket #87-1 at 357).

In the early morning of November 8, 2017, the day after his surgery, Plaintiff awoke in pain. He had last received Norco nearly 7 hours earlier. He went to the dayroom on his crutches and notified the on-duty officer, Bornick, of his need for pain medication. He showed Bornick his prescription and patient discharge paperwork. Bornick consulted with his supervisor, Leblanc, who assessed Plaintiff's prescription, which indicated Norco QID PRN. Bornick then returned to Plaintiff and explained that they did not believe that his medication should be dispensed at night. Bornick advised that Plaintiff would receive Norco in the morning, during the medications pass. According to Plaintiff, Bornick expressed some concern about over-distributing pain medication, which prisoners could use to get high. This was not applicable to Plaintiff, who had just undergone surgery. In any case, neither defendant called the on-duty nurse. Bornick provided Plaintiff with some ice to ease the pain.

Following his surgery, HSU staff nurses Whitman and Ludwig also declined to give Plaintiff a dosage of Norco in the middle of the night, despite the fact that Plaintiff was instructed to take it every six hours, or as needed. Additionally, between November 12 and November 15, Plaintiff suffered a two-and-a-half-day delay in the receipt of his pain medication. He also suffered another two-day delay in receiving Norco after his prescription was refilled by Dr. Bertram on November 20, 2017. Plaintiff continued to be in extreme pain, and complained through the Inmate Complaint System for more Norco.

On November 11, 2017 Plaintiff returned to the HSU for his medication. He sought a cane in lieu of crutches, and asked when his dressing would be changed. Plaintiff was informed that no cane was ordered (only crutches or wheelchair), and the HSU had orders indicating

that Plaintiff's wound dressing should not be changed until the follow up appointment with the specialist.

On November 13, 2017, Plaintiff returned to the HSU. The nurse on duty secured permission for Plaintiff to wear cut-off socks on his left foot, to accommodate his surgery. On November 20, 2017, Plaintiff saw Dr. Bertram for a follow up. Dr. Bertram determined that Plaintiff was doing well, and ordered another five days of Norco and ibuprofen. On December 6, 2017, Plaintiff saw Dr. Bertram for his four-week post-operative visit. Dr. Bertram removed the sutures and the shower and work restrictions that had been placed on Plaintiff, and ordered him to continue taking ibuprofen.

On December 14, 2017, Plaintiff met with Nurse Frank, who continued Plaintiff's lower bunk restriction and his extra pillow allowance, and referred him to the Special Needs Committee ("SNC") to determine what longer restrictions might apply. On December 20, 2017, Plaintiff saw Dr. Bertram for his six-week post-operative visit. Dr. Bertram noted that Plaintiff was doing well, should continue using the orthotics, and follow up in three months. On February 13, 2018, Plaintiff was permitted a long-term lower bunk and extra pillow allowance.

On April 4, 2018, Plaintiff saw Dr. Sarik Parikh ("Parikh") for a follow up. Dr. Parikh noted that Plaintiff lacked stability and function in one of his toes as a result of the first surgery. She continued Plaintiff's lower bunk restriction and orthotics recommendation, and suggested surgery to fix the non-functioning toe. Plaintiff was cleared for surgery, and underwent surgery on July 23, 2018. The surgery resulted in a successful amputation. Plaintiff received a temporary Norco prescription as well as a surgical shoe, a cane, and an extra pillow.

However, in the early morning of July 24, 2018, the day after his surgery, Plaintiff awoke several times during the night and was again denied pain medication. He learned that Dr. Charles Larson had ordered him to only receive medication during the medication pass, four times per day—i.e., not at night. Plaintiff was back in the HSU on July 24, 25, and 27 to redress his wound dressings, which got wet in the shower.

On August 9, 2018, Plaintiff saw Dr. Parikh for a follow up. She removed the incisions and issued a prescription for orthotics and Lyrica. The Lyrica prescription was denied on August 17, 2018 due to prison regulations. Additionally, on August 23, 2018, the outside podiatry clinic cancelled Plaintiff's two post-operative visits, deeming them unnecessary.

On September 23, 2018, an orthopedist made casts for Plaintiff's second round of orthotics. On September 25, 2018, Plaintiff returned to the HSU, complaining of pain. Nurse Carol Radovich resubmitted his Lyrica prescription with increased and corrected detail. This prescription was approved on October 1, 2018. Plaintiff also received refills of ibuprofen and acetaminophen on September 27, 2018, a day after he requested a refill.

On October 3, 2018, Plaintiff submitted an HSR complaining of the way in which his Lyrica prescription was dispensed. HSU staff responded that it was dispensed according to the provider's orders, which specified that it should be taken in the morning and at bedtime. On October 7, 8, and 9, Plaintiff submitted HSRs complaining of various restrictions including access to ice and pillows. These restrictions were each temporarily extended. On October 23, 2018, the SNC denied a new restriction on medical ice and extra pillows, but approved of the cane restriction for an additional six months. On October 2 9, 2018,Plaintiff submitted an HSR seeking to change the time the Lyrica was dispersed from bedtime to the

evening medications pass. The HSR acquiesced, and responded that future prescriptions would reflect this change.

On November 13, 2018, Plaintiff returned to the HSU to complain about his foot pain medication. HSU staff responded by increasing his Lyrica dosage from 50 to 75 mg. On November 16, 2018, HSU extended his extra pillow restriction for another month. On November 20, 2018, Plaintiff had an appointment with the orthopedist for his orthotics fitting. He was instructed on how to break them in.

On November 25 and December 3 of 2018, Plaintiff submitted two HSRs asking if a post-operative follow-up appointment had been made. The HSU responded to both HSRs; in their response to the latter HSR, they indicated that a follow-up appointment had been scheduled. On January 15, 2019, Plaintiff complained about his orthotics to Nurse Radovich, who noted that he would see his podiatrist in a few days. On January 4, 2019, Plaintiff submitted a request to refill his Lyrica and ibuprofen. The request was denied in part because Plaintiff's Lyrica had not yet run out.

On January 17, 2019, Plaintiff had his follow-up appointment with Dr. Parikh. At this juncture, Dr. Parikh recommended an additional surgery to address the continued pain. According to Plaintiff, Dr. Parikh intimated that if the nerve pain had been addressed immediately after the injury, the amputations may not have been necessary. She also ordered a permanent cane restriction and an extra pillow, as well as refurbished orthotics and medical shoes, since the current orthotics caused Plaintiff pain.

Plaintiff surgery was categorized as non-urgent and required approval. Plaintiff submitted several HSRs asking when the surgery would be scheduled. He was told by HSU that the staff was still waiting for approval. On February 27, 2019, Nurse Ludwig followed up on the

approval process. She learned that the surgery had been approved, and was scheduled for April. Plaintiff's prescription for shoes and orthotics would be scheduled after he healed from the third surgery.

### 2.2.3   Submitted Letters and Complaints

On April 23 and May 30 of 2016, Plaintiff wrote letters to Vasquez, the Health Services Manager, and Kemper, the RCI prison warden, regarding his untreated foot condition. Specifically, he sought a follow up with Dr. Matthew Larsen for his ongoing foot pain. Nurse Frazier investigated both issues at the request of Vasquez and Kemper. On April 29, 2016, Frazier responded to Plaintiff's April 23 letter by clarifying that the x-ray did not show a fracture, and stating that the HSU was in the process of getting orthotics through an outside provider. On June 3, 2016, Frazier responded to Plaintiff's May 30 letter by informing Vasquez and Kemper that Plaintiff had an appointment scheduled with an outside orthotics.

On October 25, 2017, while at FLCI, Plaintiff filed an inmate complaint stating that he needed an MRI and foot surgery. On November 15, 2017, inmate complaint examiner Bartow contacted Whitman, the HSU manager at FLCI. Whitman informed Bartow that Plaintiff had undergone an MRI and foot surgery on November 2 and 7, respectively, and therefore the issue was moot. Reviewing Authority Alsum dismissed the complaint on November 20, 2017. Plaintiff appealed, but it was dismissed.

On November 7, 2017—the day of his surgery—Plaintiff filed a complaint stating that he had not received proper medical care or surgery for his foot. That complaint, too, was rejected by Bartow and affirmed by Alsum, in light of the fact that Plaintiff received surgery later that day.

On November 22, 2017, Plaintiff filed a complaint stating that he had not received medication—specifically, his Norco—from LeBlanc and Bornick as needed. Bartow spoke with Whitman, who confirmed that Plaintiff's prescription was available at medication pass times only. The medication pass times occur four times per day, but do not extend into the night. Whitman confirmed that the security officers were correct in not giving him medication at night, per HSU orders. Whitman informed Bartow that Plaintiff was provided ice, and had access to ibuprofen. Alsum affirmed the complaint, noting that Plaintiff was only prescribed Norco during the medications pass periods, and affirming the delay between prescriptions for Norco. She determined that despite this, Plaintiff received ongoing care and treatment, including with ibuprofen. Plaintiff appealed, but Alsum's decision and modification were affirmed.

On August 6, 2018, Plaintiff complained again that he was not receiving his Norco prescription at night. The complaint was initially affirmed, but dismissed upon further review because the prescription was ordered to be given "QID" or *quarter in die,* i.e., during medication pass in the morning, noon, afternoon, and bedtime. As what happened in November, it appears that the medication was given four times per day, but not in six-hour intervals.

On August 30, 2018, Plaintiff complained that he was denied his prescription for Lyrica. Bartow dismissed the complaint, because the prescription had been denied by the medical director. Alsum contacted Whitman, who told her that a non-formulary request was resubmitted with different dosage specifications, and ultimately approved. This complaint was dismissed.

Plaintiff currently suffers an amputated toe, walks with a limp, must wear orthotics, and takes medication twice per day.

### 2.3 Analysis

#### 2.3.1 Exhaustion of Administrative Remedies

##### 2.3.1.1 Kemper, Krembs, Vasquez, and Frazier

Before a prisoner files a lawsuit regarding prisoner conditions, he must exhaust the administrative remedies available at the institution in which he is incarcerated. 42 U.S.C. § 1997e(a). Here, there is no evidence that Plaintiff exhausted his administrative remedies as to Kemper, Dr. Krembs, Vasquez, and Frazier while at RCI. Plaintiff argues that his complaints were exhausted under the "continuing violations doctrine." *See Edwards v. Schrubbe*, 807 F. Supp. 2d 809, 812 (E.D. Wis. 2011) (finding a complaint was timely when it was "clear" that the plaintiff complained about "an ongoing denial of medical treatment rather than one isolated incident" and the complaint documented the "repeated efforts to resolve the grievance").

Here, Plaintiff contends that his October 25, 2017 and November 7, 2017 inmate complaints at FLCI, when taken as a whole, demonstrate that he complained about an "ongoing denial of medical treatment rather than an isolated incident." (Docket #97 at 13–14). These complaints—particularly the November 7, 2017 complaint—broadly recount Plaintiff's frustration with his medical care, including care received at RCI, and request surgery. (Docket #89-3 at 8). However, the FLCI complaints do not name the RCI defendants, and they do not put RCI on notice that Plaintiff sought to administratively exhaust the claims arising from his time there.

The Court is not inclined to permit unexhausted claims to proceed against Kemper, Dr. Krembs, Vasquez, and Frazier. First, there is no

showing that Plaintiff attempted to exhaust a complaint against them at RCI. Additionally, Plaintiff does not explain why he never submitted an inmate complaint against them, even though he employed the inmate complaint process at RCI for other issues. Although Plaintiff wrote two letters to Kemper, Vasquez, and Frazier in April and May 2016 seeking follow up with Dr. Matthew Larsen, this is not sufficient to satisfy the exhaustion requirement. *Pozo*, 286 F.3d at 1025 (explaining that substantial compliance with exhaustion requirements does not satisfy the PLRA); *c.f. Wilder v. Sutton*, 310 F. App'x 10, 12–14 (7th Cir. 2009) (finding that prisoner exhausted all available remedies when he submitted two complaints which went unanswered). The responses to the letters swiftly and thoroughly addressed Plaintiff's needs, and there was no further attempt by Plaintiff to complain to these defendants. If Plaintiff wanted to exhaust his concerns about the delays in his follow up appointments, then the appropriate recourse would have been to file an inmate complaint at RCI in order to put the defendants on notice of the issue, allow them the opportunity to correct it, and potentially reduce the scope of litigation. *Smith*, 255 F.3d at 450–51.

The Court is also reluctant to find that Plaintiff's medical care constituted a "continuing wrong"—particularly against the factual backdrop, which demonstrates a robust and ongoing response to Plaintiff's needs at both RCI and FLCI. While these responses were not always to Plaintiff's liking, they were also multi-tiered, reasonably consistent, and sought outside expertise on multiple occasions. Moreover, a considerable amount of time had lapsed between Plaintiff's 2016 letters to RCI officials and the 2017 complaints submitted at FLCI. The letters sent to RCI staff and the complaints exhausted at FLCI each indicate a broad, general dissatisfaction with the medical treatment he received for his foot, and a

desire for surgical intervention. But they were also submitted a year and a half apart and to officials at two different institutions, despite the fact that Plaintiff knew he could submit inmate complaints at RCI.

In light of the record, the Court finds that the claims against these four defendants are not administratively exhausted. In the Court's view, even if the claims were exhausted, the record does not suggest deliberate indifference on any defendant's part.[2] Regardless of that observation, the Eighth Amendment claims against Kemper, Dr. Krembs, Vasquez, and Frazier will be dismissed without prejudice for failure to exhaust.

### 2.3.1.2 Lyyski

There is no evidence that Plaintiff submitted an inmate complaint against Lyyski. Plaintiff claims that Lyyski confiscated his New Balance sneakers, which were well-suited for his orthotics, when he entered FLCI. Plaintiff does not dispute the fact that he never filed an inmate complaint against Lyyski. (Docket #99 at 25–26). An inmate is required to exhaust his

---

[2]Plaintiff's primary issue is that he was never given a follow-up appointment to his April 7, 2016 appointment with Dr. Matthew Larsen— although he did receive multiple follow-ups with Dr. Krembs. Plaintiff believes that because he was not given a follow-up with Dr. Matthew Larsen despite his requests, the defendants were necessarily indifferent. Yet, as the facts demonstrate, Defendants did not ignore his requests or act with total unconcern for his wellbeing. Plaintiff corresponded with Kemper, Frazier, and Vasquez less than two months after he saw Dr. Matthew Larsen. Upon investigating the first letter, Frazier confirmed that Plaintiff had been approved for orthotics; upon investigating the second letter, Frazier confirmed that Plaintiff had secured an appointment for with the orthopedist. This does not evince deliberate indifference. Moreover, Plaintiff contends that Dr. Krembs provided inadequate care compared to Dr. Matthew Larsen, but inadequate care, alone, does not give rise to a deliberate indifference claim. Dr. Krembs, working off the results of two x-rays which showed no cause for concern, continued to monitor Plaintiff's progress with the orthotics and administered a variety pain medication to help control Plaintiff's discomfort.

administrative remedies before filing a complaint; substantial compliance does not satisfy the PLRA. *Pozo*, 286 F.3d at 1025. Since Plaintiff never filed a complaint against Lyyski, he has not even begun to exhaust his administrative remedies. Therefore, the claim against Lyyski must be dismissed without prejudice.

### 2.3.2 Eighth Amendment Claims

The Eighth Amendment's "deliberate indifference" standard requires that (1) a prisoner suffered from an objectively serious medical condition; (2) the government official subjectively knew of the condition and was deliberately indifferent in treating it; and (3) this indifference caused the prisoner's injury. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). "A serious medical condition is one that has been diagnosed by a physician as mandating treatment." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The parties do not dispute whether Plaintiff's foot condition, and resulting pain, constitute a serious medical condition.

The critical question is whether Defendants were deliberately indifferent to Plaintiff's foot condition and pain at various intervals over the years. Establishing deliberate indifference is a heavy burden. To be deliberately indifferent, "[t]he official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Gayton*, 593 F.3d at 620. Even if an official is aware of the risk to the inmate's health, he is not liable if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000); *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005).

The Seventh Circuit has emphasized that deliberate indifference "comprehends more than mere negligence but less than the purposeful or knowing infliction of harm." *Estate of Novack,* 226 F.3d at 529; *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). Indeed, the Court of Appeals has characterized the required showing "as 'something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks.'" *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) (quoting *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992)). The operative inquiry is not whether the inmate believes some other course of treatment would have been better. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996); *Reynolds v. Barnes*, 84 F. App'x 672, 674 (7th Cir. 2003) ("[T]he Constitution does not mandate that a prisoner receive exactly the medical treatment he desires.").

With these principles in mind, the Court will analyze each defendant's responsibility in turn.

### 2.3.2.1     LeBlanc and Bornick

It is well settled that officers and non-medical defendants may "rely on the expertise of medical personnel." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). Indeed, non-medical staff at a correctional facility are "entitled to defer to the judgment of jail health professionals so long as they did not ignore the prisoner." *King v. Kramer*, 680 F.3d 1013, 1019 (7th Cir. 2012) (citations and internal quotations omitted).

In this case, Plaintiff approached Bornick the night after his surgery, complaining of pain and seeking another dose of Norco. Bornick consulted with his supervisor, LeBlanc, who considered Plaintiff's medical paperwork and determined that Plaintiff should not receive medication at night. Bornick informed Plaintiff that he was not authorized to receive medication until morning, and provided Plaintiff with some ice to hold him

over. Bornick also expressed some concern about inmates abusing narcotics, which Plaintiff found disrespectful as he had just gotten out of surgery.

The record reflects some confusion about when Plaintiff was meant to receive Norco. He was instructed by his surgeon to take it once every six hours, which breaks down to four times per day. At FLCI, medications are issued four times per day as follows: morning, mid-day, afternoon/evening, and bedtime. Thus, an inmate might receive medication four times per day, but not in six-hour increments. Notwithstanding this error, the record does not reflect that defendants LeBlanc and Bornick were deliberately indifferent to Plaintiff's pain. They did not brush off his concern. Rather, they checked his prescription, formulated a basis for their decision not to issue medication, and then provided Plaintiff with some ice to hold him over. While perhaps an imperfect post-operative remedy, these defendants did not evince a "total unconcern" for Plaintiff's wellbeing. *Collins*, 462 F.3d at 762. Accordingly, the Eighth Amendment claims against them must be dismissed.

### 2.3.2.2      Whitman and Ludwig

Plaintiff was told by a non-party nurse that Nurses Whitman and Ludwig ordered that he could not receive Norco at night. Plaintiff concludes that since Nurse Whitman's "responsibilities include directing and facilitating the implementation of and evaluation of treatment plans and monitoring off site health providers. . .[and] assur[ing] that health care plans are carried out. . .she accepted responsibility for failure to dispense medications as prescribed." (Docket #97 at 27). This may have been Whitman's job description, but it is not evidence that Whitman was aware

of Plaintiff's Norco issue—i.e., that the dispensation times had been misunderstood—and was willfully indifferent to it.

Similarly, Plaintiff interacted with Nurse Ludwig several times. Plaintiff believes that she "began a regiment [*sic*] of denying multiple doctor's orders stating it needed to be done through the special needs committee." *Id.* at 28. But the record also indicates that Nurse Ludwig promptly referred Plaintiff to the SNC, which then evaluated and continued various recommendations. Moreover, these referrals to the SNC occurred weeks after the doctor's orders were initially given and carried out. The fact that the orders were reviewed on a regular basis by a prison committee does not, in and of itself, suggest deliberate indifference, nor is there any evidence that Nurse Ludwig enacted this bureaucratic requirement to cause Plaintiff distress. Accordingly, the claims of deliberate indifference against Nurses Ludwig and Whitman must be dismissed.

### 2.3.2.3    Larson

Plaintiff contends that Dr. Charles Larson erroneously and unilaterally changed the prescription—which required Norco to be administered once every six hours, post operatively—to reflect that Plaintiff should only receive it at medication passes. Plaintiff claims that Nurse Terry Kiser told him this, but Plaintiff has not provided any affidavit from Nurse Terry Kiser to this effect, and the Court has no basis on which to admit this otherwise inadmissible hearsay evidence.

Moreover, Plaintiff provides no other evidence for the fact that Dr. Charles Larson ignored the prescription issued by Dr. Parikh, or that the misinterpretation of the prescription was anything other than serious negligence. Defendants have provided evidence indicating that Plaintiff's Norco prescription was ordered to be given "QID PRN," i.e., during

medication pass in the morning, noon, afternoon, and bedtime. In other words, it appears that the medication was given four times per day, but not in six-hour increments. It may have been negligent for Dr. Charles Larson to overlook this or fail to abide by the prescribing doctor's orders, but this does not give rise to a claim of deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("Neither medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment.").

### 2.3.2.4    Bartow, Alsum, Davidson, and Jess

Plaintiff contends that Bartow, Alsum, and Davidson were deliberately indifferent to a serious medical need when they variously denied and affirmed the denial of his inmate complaints seeking an MRI, foot surgery, and Norco.[3] The record indicates that between October 2017 and August 2018, Plaintiff filed five inmate complaints at FLCI. For each complaint, Bartow conferred with Whitman about what occurred and whether there was cause for concern. Bartow did not issue rote denials of Plaintiff's complaints. She investigated the brief delay in medication on November 22, 2017 and determined that it had been remedied. She also affirmed his August 6 complaint regarding the failure to provide Norco at night.

---

[3] Defendants broadly submit that Davidson and Jess did not act with deliberate indifference, and Plaintiff does not bring forth evidence or argument regarding either defendant, except to say that if a proper investigation had been conducted, his pain would have been averted. However, there is no evidence that Davidson or Jess refused to read his grievances or purposefully acted in ways to prevent Plaintiff from receiving care. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Accordingly, the Eighth Amendment claims against them will be dismissed for want of evidence.

Alsum reviewed Bartow's work, and she, too, did not blindly affirm these conclusions. For the November 22, 2017 complaint, Alsum reiterated that Plaintiff was prescribed medication four times per day, and affirmed the fact that there had been a brief, temporary delay in the Norco prescription refill. Similarly, for the August 6, 2018 complaint, Alsum dismissed the complaint after determining that Plaintiff *was* receiving his medication four times per day, just not in six-hour increments. Similarly, Alsum investigated Plaintiff's complaint that his Lyrica prescription had been denied, and learned that it had just been approved.

The record demonstrates that Bartow thoroughly investigated each complaint, and Alsum adequately followed up on the investigation. These examiners are permitted to rely on the medical assessments of the HSU staff, and to defer to their evaluations of the Plaintiff's medical need. *Burks*, 555 F.3d at 595 ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). The brief and apparently accidental delay in the Norco prescription—and the apparent, repeated confusion over four times per day versus every six hours—does not evince deliberate indifference. This is particularly true in light of the other actions that Bartow, Alsum, and Whitman took to ensure that Plaintiff received an MRI, surgery, and post-operative palliatives. *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997) (holding that a "detailed account of treatment" over the course of several months belied a claim for deliberate indifference, notwithstanding "an isolated occasion or two where he did not receive prompt treatment.").

### 2.3.3. Negligence Claims

Having determined that Plaintiff's constitutional claims are either without merit or unexhausted, the Court declines to exercise its

supplemental jurisdiction over the negligence claims involving Dr. Krembs, Vasquez, and Frazier. 28 U.S.C. § 1367(c)(3). The Court will not evaluate whether Plaintiff has provided sufficient evidence to establish the standard of care in medical malpractice claims, although it appears that he has not. In any case, those claims will be dismissed without prejudice. Plaintiff may file those claims in state court.

**3.     CONCLUSION**

Plaintiff's extremely lengthy and well-documented medical record contradicts any Eighth Amendment claim that he may have had against these defendants. Plaintiff also failed to comply with the statutory prerequisites to filing non-medical negligence claims against defendants. Finally, the Court declines to exercise supplemental jurisdiction over any remaining negligence claims.

Accordingly,

**IT IS ORDERED** that Defendants' motion to dismiss (Docket #83) be and the same is hereby **GRANTED in part and DENIED in part**;

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (Docket #83) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that all Eighth Amendment claims against Defendants Lonel Leblanc, Glenn Bornick, Candice Whitman, Julie Ludwig, Charles Larson, Laura Bartow, Lori Alsum, Emily Davidson, and Cathy Jess be and the same are hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that the Eighth Amendment claims against Defendants Paul Kemper, Dr. Kevin Krembs, Kristen Vasquez, Laura Frazier, and Roxanne Lyyski be and the same are hereby **DISMISSED without prejudice** for failure to exhaust;

**IT IS FURTHER ORDERED** that all negligence claims against Defendants Paul Kemper, Lonel Leblanc, and Glenn Bornick be and the same are hereby **DISMISSED without prejudice** for failure to issue a notice of claim;

**IT IS FURTHER ORDERED** that the Court, pursuant to 28 U.S.C. § 1367(c), declines to exercise supplemental jurisdiction over the state law medical malpractice claims against Defendants Dr. Kevin Krembs, Kristen Vasquez, and Laura Frazier and such claims be and the same are hereby **DISMISSED without prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 26th day of March, 2020.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge